1

1

2            UNITED STATES DISTRICT COURT

3           SOUTHERN DISTRICT OF FLORIDA

4 - - - - - - - - - - - - - - - - - - x
NANCI E. APONTE,                  :

5            Plaintiff,         :

6

7           -against-         Case No.
01-8551-CIV

8 THE WEITZ COMPANY, INC., and     :
ROBERT W. SWAFFORD,

9

10           Defendants.     :

- - - - - - - - - - - - - - - - - - x

11

12

13     VIDEOTAPE DEPOSITION of ITZHAK C. HAIMOVIC,

14 M.D., taken by Plaintiff, pursuant to Notice, at

15 the offices of Dr. Itzhak C. Haimovic, 333 East

16 Shore Road, Manhasset, New York 11030, on Friday,

17 February 15, 2002, commencing at 7:18 o'clock

18 a.m., before Annette Forbes, a Certified Shorthand

19 (Stenotype) Reporter and Notary Public within and

20 for the State of New York.

21

22

23

24

25

2

1

2      A P P E A R A N C E S:

3              LAW OFFICES OF STEINBERG & ASSOCIATES, P.A.
                        Attorneys for Plaintiff
4                       767 Arthur Godfrey Road
                        Miami Beach, Florida  33140-3413
5
               BY:   ANTHONY V. FALZON, Esq., of Counsel
6

7
               Messrs. PETERSON, BERNARD, VANDENBERG,
8                ZEI, GEISLER & MARTIN
                        Attorneys for Defendants
9                       707 Southeast Third Avenue
                        5th Floor
10                      Fort Lauderdale, Florida  33316

11             BY:   WILLIAM M. MARTIN, Esq., of Counsel

12

13     ALSO PRESENT:

14             JAMES BRADY, Videographer
                        Fink & Carney Reporting and Video
15                      39 West 37th Street
                        New York, New York  10018
16

17

18

19

20

21

22

23

24

25

3

1          Haimovic

2              MR. MARTIN:  It's now about

3      7:18 a.m. by my watch.  I understand

4      that that deposition was noticed for

5      two hours and that two hours have been

6      reserved.  I need about 45 minutes for

7      cross-examination.

8              MR. FALZON:  As I said, the

9      deposition has been noticed for a

10     while.  We made our arrangements for

11     the amount of time that we thought we

12     would need for direct examination.

13             I'm sure Mr. Martin has made

14     his own arrangements for the doctor to

15     reserve time for cross-examination.  I

16     will do my best to get through before

17     the expiration of the two hours.

18             MR. MARTIN:  That's not how

19     the rules work.  My objection is

20     noted.

21             THE VIDEOGRAPHER:  Today's

22     date is February 15, 2000.  The time

23     is 7:18 a.m.

24             My name is Jim Brady.  I am

25     the videographer.  We are here in the

4

```
 1              Haimovic
 2       case of Nanci Aponte versus the Weitz
 3       Company, et al.
 4              May I ask now that the
 5       attorneys introduce themselves and for
 6       the court reporter to swear in the
 7       witness?
 8              MR. FALZON:  My name is
 9       Anthony Falzon from the Law Offices of
10       Steinberg & Associates.  I represent
11       the plaintiff Nanci Aponte in this
12       case.
13              MR. MARTIN:  Bill Martin, I
14       represent the defendants, the Weitz
15       Company and Robert Swafford.
16  I T Z H A K    C.    H A I M O V I C, called as a
17       witness, having been first duly sworn by
18       Annette Forbes, a Notary Public of the
19       State of New York, was examined and
20       testified as follows:
21  DIRECT EXAMINATION
22  BY MR. FALZON:
23        Q     Dr. Haimovic, can you tell us your
24  full name?
25        A     Yes.  Haimovic, H-a-i-m-o-v-i-c,
```

5

```
 1                        Haimovic
 2     first name is I-t-z-h-a-k.
 3              Q      What is your professional address?
 4              A      333 East Shore Road, Manhasset, New
 5     York 11030.
 6              Q      And your occupation?
 7              A      I'm a neurologist.
 8              Q      Dr. Haimovic, you treated Nanci
 9     Aponte after she was injured in a car accident on
10     February 1, 2000; is that correct?
11              A      Yes.
12              Q      Before we get your treatment of Ms.
13     Aponte, Dr. Haimovic, I am going to ask you some
14     questions about your background as a doctor.
15                     Are you licensed to practice
16     medicine in the State of New York?
17              A      Yes.
18              Q      How many years have you been
19     licensed?
20              A      About 24.
21              Q      Where did you receive your
22     undergraduate education?
23              A      New York University.
24              Q      In what year did you graduate?
25              A      '72.
```

6

1                           Haimovic

2          Q       What medical school did you attend?

3          A       New York Medical College.

4          Q       Did you receive a degree from that

5     school?

6          A       Yes.

7          Q       Where did you do your internship?

8          A       At North Shore University Hospital

9     and Cornell Cooperating Hospitals.

10         Q       Could explain to the jury what an

11    internship is?

12         A       It's a rotation in the hospital

13    where we treat patients.

14         Q       Did you afterwards specialize in any

15    particular field of medicine?

16         A       Neurology.

17         Q       What is neurology?

18         A       It's a field that studies the

19    nervous system.

20         Q       Would a neurologist be qualified to

21    diagnose or even treat a psychological or

22    psychiatric illness?

23         A       No.

24         Q       After doing your residency in

25    neurology, where did you continue your training?

7

1                           Haimovic
2          A       At North Shore University Hospital
3    and Cornell Cooperating Hospitals, and I did my
4    residency in the same place.  I did a fellowship
5    in neurophysiology at Columbia University.
6          Q       Just so that I understand, what does
7    a residency program consist of?
8          A       Seeing patients.
9          Q       And you said that you went on to do
10   a fellowship.  What is a fellowship?
11         A       It's a post graduate study program.
12         Q       And you said you did your fellowship
13   in neuro --
14         A       Physiology.  Clinical
15   neurophysiology.
16         Q       What is clinical neurophysiology?
17         A       It's the study of representation of
18   physiological activities of the body, brain wave
19   test.
20         Q       Just so that I understand, I'm a
21   layman here, what is physiological activity of the
22   body?
23         A       EEG, EMG.
24         Q       Are you Board certified in the field
25   of neurology?

8

1                          Haimovic

2          A     Yes.

3          Q     What are the requirements for

4    becoming board certified?

5          A     You have to complete a residency

6    program and pass the test.

7          Q     You obviously completed those

8    requirements?

9          A     Yes.

10         Q     And by which board are you

11   certified?

12         A     Neurology.

13         Q     Is that the American Board of

14   Neurology?

15         A     Yes.

16                    MR. MARTIN:  I object to the

17              form.

18         Q     Is your certification the highest

19   certification one can obtain in the field of

20   neurology?

21         A     Yes.

22         Q     How long have you been Board

23   certified?

24         A     About 20 years, approximately.

25         Q     Dr. Haimovic, are you on the staff

9

```
1                           Haimovic
2        of any hospitals?
3              A      Yes.
4              Q      Which hospitals are those?
5              A      North Shore Hospital and Long Island
6        Jewish Hospital, St. Francis and Winthrop.
7              Q      Do you hold any teaching positions
8        in your specialty?
9              A      Yes, I am a clinical associate
10       professor.
11             Q      Where is that?
12             A      At New York University.
13             Q      How long have you held that teaching
14       position?
15             A      For many years, over 15.
16             Q      Are you a member of any medical
17       associations and, if so, which association?
18             A      American Neurological Association.
19             Q      Are there any other qualifications
20       which you have that I haven't asked you about?
21             A      Not that I can remember right
22       offhand.
23             Q      Do you have a copy of your resume
24       available?
25             A      I might.
```

10

```
 1                       Haimovic
 2           Q     Can I have that resume marked as
 3    Exhibit A, Plaintiff's Exhibit A to this
 4    deposition?
 5                       (Resume was deemed marked as
 6                 Plaintiff's Exhibit A for
 7                 identification, as of this date.)
 8    BY MR. FALZON:
 9           Q     Dr. Haimovic, are you engaged in the
10    private practice of medicine?
11           A     Yes.
12           Q     How long have you been practicing
13    medicine?
14           A     Twenty years.
15           Q     I assume that that practice is in
16    neurology?
17           A     Yes.
18           Q     Does your practice center on any
19    particular aspect of neurology?
20           A     No.
21           Q     Have you treated patients in your
22    practice suffering from reflex sympathetic
23    dystrophy?
24           A     Yes.
25           Q     How many patients over the years
```

11

1                         Haimovic

2     have you treated suffering from that disease?

3          A     I do not know.

4          Q     Would that be more than 100 or less

5     than 100?

6          A     I do not know.  I don't keep count.

7          Q     Is it too many to count?

8                     MR. MARTIN:  I object to form.

9                     Leading.

10         A     Pardon me?

11         Q     Are there so any patients that you

12    have treated with that disease that you have lost

13    count of them?

14                    MR. MARTIN:  Same objection.

15         A     As I said, I don't keep count, but I

16    have seen patients.

17         Q     How many patients have you seen over

18    the last twelve months suffering from reflex

19    sympathetic dystrophy, in your estimation?

20         A     Where the issue came up of reflex

21    sympathetic dystrophy?  Maybe 15.

22               That's just a gross guess though.

23         Q     What is reflex sympathetic

24    dystrophy?

25         A     It's a condition where patients have

Haimovic

1   severe pain in a limb which is associated with a

2   few features, which include what we call

3   causalgia, which is severe, agonizing pain in

4   relation to trivial stimuli like air blowing over

5   a limb or the gentlest touch, which is also

6   sometimes associated with atrophy of the skin,

7   wasting of the skin, discoloration of the skin,

8   loss of nails.

9        Q     Does reflex sympathetic dystrophy

10   have various stages?

11        A     Yes.

12        Q     What are those stages and how would

13   you notice that a patient is moving from stage one

14   to the next stage and so on?

15        A     Well, the stages are, in the earlier

16   stages you have severe pain and a certain form of

17   discoloration of the skin.

18             In the later stages you have atrophy

19   of the skin and atrophy of the nail beds and loss

20   of hair and profound pain also.

21        Q     So how many stages are there

22   medically?

23        A     We are talking about four.

24        Q     Is RSD a recently discovered

13

Haimovic

1    illness?

2         A     No.

3         Q     How long has the medical community

4    been aware of and treated RSD?

5                  MR. MARTIN:  I object.

6                  Predicate.

7         A     Many years.  Over 50, maybe 100.

8         Q     Is RSD limited to the part of the

9    body which is initially affected with it or does

10   it spread?

11                 MR. MARTIN:  I object.

12                 Predicate.  Form.

13        A     It doesn't spread.  I don't believe

14   that it spreads.  Some people claim that it

15   spreads.  I don't believe that it spreads.

16        Q     Does it remain limited to the

17   nervous system or does it affect other areas of

18   the body?

19        A     It may affect the bone.

20        Q     Can it affect the muscles?

21        A     Yes.

22        Q     What about the skin?

23        A     Yes.

24        Q     What about the autonomic immune

25

14

Haimovic

1    system?

2

3          A      There is no such thing as autonomic

4    immune system.  I don't know what you are

5    referring to.

6          Q      Would the body's immune system be

7    affected by RSD?

8          A      Not to my knowledge.

9          Q      What causes RSD?

10         A      We don't know.

11         Q      It sounds to me as a layman as if

12   RSD is basically prolonged pain induced by injury,

13   is that --

14                    MR. MARTIN:  I object.

15                    Leading.

16         A      That would be a reasonable

17   explanation.

18         Q      How would a person injured and

19   suffering from pain from that injury know that

20   they have RSD, if RSD is simply prolonged pain?

21         A      It's the nature of the pain.

22                As I have indicated before, trivial

23   stimuli could produce severe agonizing pain.

24   There can be atrophy of the skin, hair loss,

25   discoloration, changes in temperature.

15

1                          Haimovic

2          Q     Would there also be severe burning

3     in localized areas?

4                     MR. MARTIN:  I object.

5          A     There could be.

6                     MR. MARTIN:   Objection to

7              form.   Predicate.

8          Q     How is RSD diagnosed?   Is it through

9     looking for the systems that you have just

10    elaborated on?

11         A     Yes.

12         Q     How is it treated?

13         A     With medications, injections.

14         Q     How many patients in your estimation

15    have you treated with RSD in the arm over the

16    years of your practice?

17         A     I do not keep count, so it would be

18    a very gross estimation.

19         Q     Give me that gross estimation.

20         A     As I said in the past year, maybe I

21    treated 16.  My whole life, I don't know, 30, 50.

22         Q     Dr. Haimovic, let's turn to the

23    events of February 2000.  You saw Nanci Aponte for

24    the first time February 15, 2000, correct?

25         A     Correct.

16

Haimovic

1    Q    You began a medical file for her on
3  that date?

4    A    Yes.

5    Q    Do you have that medical file with
6  you?

7    A    Yes.

8    Q    I would like to have that marked and
9  entered into the evidence as Exhibit B.

10            (Medical file deemed marked as

11            Plaintiff's Exhibit B for

12            identification, as of this date.)

13    Q    What records do you have in that
14  file?

15    A    Her office visits and her tests.

16    Q    In relation to all the records that
17  have been marked as Exhibit B, were those records
18  made from information that you got yourself or is
19  it from someone who had knowledge of the facts
20  appearing in those records?

21    A    I obtained it myself.

22    Q    Were the records made at or near the
23  time of the examinations or other events appearing
24  in them?

25    A    Yes.

17

1                          Haimovic

2          Q      Is it your regular practice to make

3    such records?

4          A      Yes.

5          Q      Were those records kept in the

6    ordinary course of regularly conducted business

7    activity?

8          A      Yes.

9          Q      Before you examined Nanci Aponte for

10   the first time on February 15, 2000, did you

11   obtain a history from her?  And you can refer to

12   your notes, obviously.

13         A      Yes.

14         Q      Was that history taken for the

15   purpose of assisting you in arriving at diagnosis?

16         A      Yes.

17         Q      What did Ms. Aponte's history

18   reveal?

19         A      That she was well until February 1,

20   2000.  At that time while in Florida she was

21   involved in a motor vehicle accident.  She was

22   struck from behind.

23                Within 24 hours she was taken to a

24   nearby hospital.  She had a CAT scan of the brain

25   and eventually diagnosis of fracture of the wrist

18

1                                     Haimovic

2      was made.  And she subsequently complained of

3      persistent pain, tingling and numbing sensation of

4      the right arm and wrist.

5                       And since the accident she

6      complained of headaches, difficulties with

7      concentration, pain in her neck, shoulder, arm and

8      forearm, tingling and numbing sensation of the

9      third, fourth and fifth fingers of the right hand.

10                      She was taking at that time Relafen

11     and Percocet, which are painkillers and

12     anti-inflammatory medication.

13                      Her examination showed that there

14     was diminished range of motion of the cervical

15     spine.

16          Q     The cervical spine being the neck?

17          A     Yes.

18                      And other findings included loss of

19     sensation in the third, fourth and fifth fingers

20     of the right hand.

21          Q     Is that indicative of RSD, for the

22     benefit of hindsight?

23          A     No.

24          Q     What else did your examination

25     reveal?

19

```
1                          Haimovic
2          A      That's all.
3          Q      Did you assess her nervous system?
4          A      Yes.
5          Q      What did that part of your
6    examination reveal?
7          A      Everything else was normal.
8          Q      Did you form an impression or
9    diagnosis at that point or tentative diagnosis?
10         A      Yes.  That she had a post-concussion
11   syndrome with persistent headaches, difficulties
12   with concentration and the possibility of a right
13   C7 radiculopathy, which is an irritated nerve in
14   the cervical spine, was made.
15         Q      I notice on Page 2 of your report
16   there are two sentences which are underlined.  Why
17   is that?
18         A      I underline all the positive
19   findings.  This way when I look at the note, I
20   immediately remember what the problem areas were.
21         Q      Did you have a plan for treatment
22   for Ms. Aponte at that time?
23         A      Yes.
24         Q      What was that plan?
25         A      To get an MRI of the brain, MRI of
```

20

                                Haimovic
1
2    the cervical spine and an EEG, which is a brain
3    wave test.
4           Q      Why did you want an MRI of the
5    brain?
6           A      To make sure she does not have a
7    blood clot on the surface of the brain.
8           Q      Did Ms. Aponte return for a visit on
9    March 2nd?
10          A      Yes.
11          Q      Did you have the results of the
12   tests that you had ordered at the earlier visit on
13   that date?
14          A      Yes.  She had an MRI of the cervical
15   spine which is normal and an MRI of the brain,
16   which was normal.
17          Q      Did you conduct another examination
18   on March 2nd of 2000?
19          A      Yes.
20          Q      What was the result of that
21   examination and what were Ms. Aponte's complaints?
22          A      She complained of headaches.  She
23   had difficulties with concentration.  She had pain
24   in the left temporomandibular joint region.
25          Q      What region is that that you just

21

Haimovic

1   pointed out?

2   A      That's the temporomandibular joint

3   region, that's where the joint is.

4   Q      Is that the region around the jaw?

5   A      Yes.

6   Q      Please continue, Doctor.

7   A      And examination showed marked

8   limitation of motion of the neck.

9              There was also limitation of the

10  left, motion of the left temporomandibular joint.

11             She had mild recent memory

12  impairment, and she had mild diminished sensation

13  to pin over the thumb, index finger and also

14  palmar aspects.

15  Q      On the basis of the examination that

16  she took on that date, did you formulate a

17  tentative diagnosis?

18  A      Yes.

19  Q      What was that diagnosis at that

20  point?

21  A      That she had a right cervical

22  radiculopathy.

23  Q      What is cervical radiculopathy?

24  A      Irritated nerve in the cervical

22

1                              Haimovic

2      spine.

3              Q       Which is the neck?

4              A       Right.  That she had a mandibular

5      joint dysfunction.

6              Q       Which is the jaw?

7              A       Some cognitive disturbances, which

8      is memory primarily.

9              Q       Did you formulate a plan at that

10     point for her continued treatment?

11             A       Yes.  I suggested that she have a

12     brain wave test which is called an EEG; an EMG, a

13     nerve conduction study; and an MRI of the

14     temporomandibular joint.

15             Q       Why did you order an EEG, an MRI of

16     the brain?

17             A       Sometimes you can see abnormality on

18     an EEG that you don't see on an MRI.

19             Q       What were you suspecting at that

20     point?

21             A       Maybe she had a cervical contusion.

22             Q       Did you obtain results of the tests

23     that you ordered on March 2nd, and what were the

24     results of these tests?

25             A       Yes.  The EEG was normal.  The MRI

23

```
 1                        Haimovic
 2    of the a temporomandibular joint showed a
 3    displaced temporomandibular menisci.
 4          Q     Did you actually read the MRI
 5    yourself or did you rely on the report?
 6          A     I relied on the report of Dr.
 7    Silvergleid.
 8          Q     Who was Dr. Silvergleid?
 9               MR. MARTIN: It's
10            S-i-l-v-e-r-g-l-e-i-d, first name is
11            Richard.
12          A     He is a neuroradiologist.
13          Q     TMJ, if one has it, is treated by a
14    dentist, is it not?
15          A     Correct.
16          Q     Did you then refer her to a dentist?
17          A     I think she was referred to a
18    dentist, yes.
19          Q     She was also being treated at a pain
20    center, wasn't she, at that point?
21          A     I think so.
22               MR. MARTIN:  I object to form.
23               Leading.
24          Q     You had a further office visit with
25    her about a month later, did you not, Doctor?
```

24

1                          Haimovic

2          A     Yes.

3          Q     And that was on April 4, 2000?

4          A     Right.

5          Q     Any positive findings on that date?

6          A     She had an EMG test at that time and

7     that was normal.

8          Q     What was your continued plan at that

9     time for treatment?

10         A     The plan was for physical therapy

11    and requested follow-up in one month.

12         Q     Had you excluded an injury to the

13    brain at that point?

14         A     I had excluded any abnormalities in

15    relationship to that, yes.

16         Q     You then went on to visit her in

17    May, did you not?

18         A     Correct.

19         Q     What was she complaining about at

20    that point?

21         A     She complained of severe pain in the

22    right hand, tingling and a numbing sensation in

23    the right hand, and persistent numbness in the

24    right hand.

25         Q     What did your examination reveal at

25

Haimovic

1    that time?

2    A    Diffuse weakness and numbness in the
3    right hand and marked tenderness to touch.

4    Q    Are those objective findings?

5    A    Those are subjective findings
6    mostly.

7    Q    You said mostly.  Was there an
8    objective component to that?

9    A    Well, the objective component would
10   be that weakness was probably in part because of
11   weakness in part because of the severe, persistent
12   pain.

13   Q    Did you form an impression on that
14   date?

15   A    The impression was that she had
16   severe intractable pain in the right hand and that
17   she probably had RSD.

18   Q    What was the basis for that
19   tentative diagnosis of RSD?

20   A    Just the severe pain that she had in
21   the hand.

22   Q    Did you formulate a plan of
23   treatment at that point?

24   A    Yes, I prescribed Neurontin.

26

1                              Haimovic
2          Q     What kind of drug is that?
3          A     It's a medication that you give for
4    severe pain.
5          Q     What dosage was she on?
6          A     100 milligrams, to be increased up
7    to 900 milligrams per day.
8          Q     That's a pretty high dosage, isn't
9    it?
10                    MR. MARTIN:  Objection.
11                    Leading.
12         A     It's a moderate dose.
13         Q     Did you prescribe any other
14   treatment?
15         A     Injection.
16         Q     What sort of injection?
17         A     An epidural injection.  Cortisone
18   and local anesthetics in the cervical spine.
19         Q     What is an epidural injection?
20         A     That's an injection that's given by
21   an anesthesiologist mostly next to the nerve in
22   the spine to reduce pain.
23         Q     Which is basically inserted into the
24   neck, the spine?
25         A     Correct.

27

1                              Haimovic

2          Q      Is that the sort of injection that

3     would be given to someone going through

4     childbirth?

5                       MR. MARTIN:  Objection.

6                       Leading.

7          Q      They talk about epidural injections.

8                       MR. MARTIN:  Same objection.

9          A      It's a different type, but it's a

10    medication, it's an injection that's given to

11    anesthetize the nerve sometimes.

12         Q      Is that sort of medication given for

13    severe pain?

14                      MR. MARTIN:  Objection.

15                      Leading.

16         A      Yes.

17         Q      You then saw her again on May 8th

18    for a follow-up, did you not?

19         A      Yes.  That's what we are discussing.

20         Q      Sorry.  On July 6th?

21         A      Yes.

22         Q      What were her complaints on July

23    6th?

24         A      Headaches, burning in the hand and

25    on examination she had diffuse weakness in the

1                          Haimovic

2    arm, severe burning sensation in the right arm.

3    And my impression was that she had reflex

4    sympathetic dystrophy and she had severe

5    intractable pain.

6              And that the Neurontin was not

7    working, I put her on a new medicine called

8    Gabitril two milligrams three times a day, which

9    is another medication for severe pain, nerve type

10   pain.

11        Q    What was your basis for impression

12   that she had reflex sympathetic dystrophy?

13        A    She had severe pain, severe burning.

14        Q    Severe burning is different from the

15   severe pain?

16        A    It's part and parcel of the whole

17   thing.

18        Q    Before you just, in your prior

19   report you referred to severe pain, now you are

20   talking about burning.

21             Does that indicate a difference in

22   the type and the scope of the pain?

23        A    Well, it's a difference in the

24   nature of the pain, and burning is seen more

25   commonly with RSD than with, let's say, cervical

29

Haimovic

1  radiculopathy, which is just a pinched nerve or an

2

3  irritated nerve.

4        Q      Did you see her on August 7th of

5  2000 for her follow-up visit?

6        A      Yes.

7        Q      And, if so, what were her

8  complaints?

9        A      Similar complaints, headaches, pain

10  in the jaw, intractable pain in the right arm.

11              Gabitril produced moderate

12  improvement, but she got a skin rash from it.

13              Examination showed diffuse weakness,

14  severe dysesthesia, which means abnormal sensation

15  to touch, and because of the severe persistent

16  pain, again, I believe she had the RSD.  I stopped

17  Gabitril, I put her on Pamelor.

18        Q      What is Pamelor?

19        A      It's an antidepressant medication

20  that is very effective with chronic pain.

21        Q      Did the pressure that you refer to

22  have a particular character to it?

23        A      A dysesthetic sensation, burning,

24  very sensitive to touch.

25        Q      Was it in a particular type of

30

1                          Haimovic

2     distribution?

3          A      Over the hand, no, it was not.

4          Q      I see here in your note a pressure

5     sensation, a band-like distribution.

6          A      That's the headache.

7          Q      Where would the band-like

8     distribution be?  Would it be on the forehead?

9     Would it be on the temple?

10         A      A band is around the head.

11         Q      So it's completely around the head?

12                MR. MARTIN:   Objection.

13         A      Not localizing in any specific area.

14         Q      What were her complaints on

15    September 7, 2000?

16         A      Neck pain, numbing sensation in the

17    arms, pain in the temporomandibular region,

18    diminished sensation over the left tongue.

19                My impression was that she lost

20    sensation of the left tongue, I did not know why.

21    That she had pain in the temporomandibular region

22    and that she had persistent right arm RSD.

23         Q      How did you test for the diminished

24    sensation in the left tongue?

25         A      Usually I test it with a pin.

31

Haimovic

1

2      Q      So, in other words, when you pricked

3  her left tongue she did not feel pain?

4      A      She had diminished sensation, yes.

5      Q      What was your plan at that point in

6  terms of treatment?

7      A      She was taking Pamelor.  She stopped

8  Gabitril.  We put her on morphine sulfate for

9  severe pain.

10     Q      Is morphine sulfate a Contin?

11     A      MS Contin, yes.

12     Q      That's in the morphine family of

13  drugs?

14     A      Yes.

15     Q      What were her complaints at her next

16  visit on October 11th of 2000?

17     A      Pain in the temporomandibular joint,

18  headaches, burning, numbing sensation, involving

19  tingling and numbness in the fingertips.

20  Hypersensitivity of the whole right arm, rarely

21  vertigo.

22          She was taking MS Contin, Vioxx and

23  Pamelor.  And physical examination showed

24  decreased strength in the right arm.

25          There was right upper extremity

                                                                    32
1                            Haimovic
2      allodynia, which is unusual sensitivity to normal
3      stimuli like wind or just the gentlest touch.
4           Q      When you talk about the right upper
5      extremity, what part of the body are we talking
6      about?
7           A      The right arm.
8                  She had diminished sensation to pain
9      in the fingertips and she had a diminished range
10     of motion in the cervical spine.
11          Q      You mentioned that she had
12     dysesthesia.  What is that?
13          A      Abnormal sensitivity.
14          Q      These are all hallmarks of RSD,
15     aren't they?
16                      MR. MARTIN:   I object.
17                      Leading.
18          A      Yes.
19          Q      What was your impression following
20     your examination of the patient on October 11,
21     2000?
22          A      That she had a post-concussion
23     syndrome, that she had RSD, that she had cervical
24     radiculopathy, and that she had a traumatic
25     temporomandibular joint dysfunction.

33

```
 1                        Haimovic
 2              And I suggested that she continue
 3    her medications.  We added Trileptyl, which is
 4    another medication for nerve pain and seizures.
 5    She was to return in a month.
 6         Q     What sort of medication is Vioxx?
 7         A     Anti-inflammatory medication.
 8         Q     So she was on MS Contin, which is in
 9    the morphine family of drugs; she was Vioxx, which
10    was an anti-inflammatory; Pamelor, an
11    antidepressant; and Trileptyl, which is a nerve
12    pain medication?
13         A     Uh-huh.
14         Q     What was the basis for the tentative
15    diagnosis of RSD?
16                   MR. MARTIN:  Asked and
17              answered.
18         A     The nature of the pain.
19                   MR. MARTIN:  Let me get the
20              objection in.
21                   Asked and answered.
22         A     The nature of her pain.
23         Q     What was the nature of that pain
24    that led you to that diagnosis?
25                   MR. MARTIN:  Asked and
```

34

1                          Haimovic

2              answered.

3         A     Burning, dysesthesia, severe

4    discomfort, severe pain.

5         Q     What were Ms. Aponte's complaints on

6    her next visit in November of 2000?

7         A     Headaches, tingling, numbness in the

8    right hand, pain in the neck.

9              Examination showed decreased range

10   of motion in the neck and decreased strength in

11   the right arm, her hand was cool, the skin was

12   waxy, positive hypesthesia of the right arm,

13   decreased sensation in the fingertips of the right

14   hand, allodynia in the right arm.

15        Q     Did she also complain of burning in

16   her fingertips?

17        A     Yes.

18        Q     When you say decreased sensation,

19   that obviously means numbness?

20        A     Correct.

21        Q     What was your impression at that

22   point?

23        A     That she suffered with RSD and

24   temporomandibular joint dysfunction and headaches.

25        Q     And your plan?

```
                                                      35
 1                      Haimovic
 2        A      Stop the Vioxx, start Oltrim.
 3        Q      Why was that?  What types of drugs
 4   are those?
 5        A      Painkiller.
 6        Q      Why did you change from Vioxx to
 7   Oltrim?
 8        A      She was not responding to RSD, her
 9   RSD was not responding.
10               And return for follow-up in a month.
11        Q      I noticed that your reports are
12   becoming longer and more involved as we go along.
13               Is that indicative of the
14   seriousness?
15               MR. MARTIN:  Objection.
16               Leading.  Form.
17        Q      Why are your reports longer?
18        A      Just a function of the dictation of
19   that date, that's all.
20        Q      What were her complaints on December
21   the 22nd of 2000?
22        A      It was headaches, nausea, pain,
23   burning in the right arm, limitation of right hand
24   movement.
25               My impression again was intractable
```

36

1                           Haimovic

2     RSD, migraine, temporomandibular joint

3     dysfunction.

4                   I recommended Imitrex for her

5     headaches and she was to return for follow-up in

6     one month.

7           Q      What do you mean by moderate

8     limitation of the right arm?

9           A      It was moderate limitation,

10    decreased movement.

11          Q      But it was not totally

12    incapacitated?

13          A      Correct.

14                 MR. MARTIN:  I'm sorry, it

15          says right hand.

16          Q      Right hand, sorry.

17                 What was your impression following

18    your examination on that date?

19          A      That she has intractable RSD, that

20    she has migraines, she has temporomandibular joint

21    dysfunction.

22          Q      What do you mean by intractable RSD?

23          A      It's not responding to treatment.

24          Q      Does that mean it's getting worse?

25          A      No.

```
 1                      Haimovic
 2                      MR. MARTIN:   Objection.
 3                      Leading.
 4           A      It means that it was there
 5      persistently.
 6           Q      What was your plan of treatment at
 7      that point?
 8           A      Imitrex for her headaches, and she
 9      was to return for follow-up in a month.
10           Q      What sort of a drug is Imitrex?
11           A      For headaches, for chronic
12      headaches, for migraines.
13           Q      What were her complaints on her
14      February 1st visit?
15           A      Headaches, dizziness, persistent
16      pain in the hand, burning in the right hand.
17                  She was taking Imitrex, Oxycontin,
18      Effexor, Pamelor, which are all pain medications
19      and antidepressant.
20                  And neurological examination showed
21      tenderness to palpation of the temporomandibular
22      joint, pain in the right arm, decreased range of
23      motion in the right arm, allodynia in the right
24      arm, neck pain, showed decreased range of motion.
25                  And the impression was persistent
```

38

1                              Haimovic

2     migraine, left temporomandibular joint dysfunction

3     and right upper extremity RSD.

4          Q    Did she describe any particular

5     symptoms of the headache?

6               I noticed at the top of the

7     complaint section she is talking about an aura the

8     day before the headache.

9               What is she talking about?

10         A    Probably migraines.

11         Q    What is the significance of the

12    nausea and vomiting, what is causing that?

13         A    That also supports the diagnosis of

14    migraines.

15         Q    I notice that you are now referring

16    to a drug as Oxycontin.  Is that the same as the

17    drug that was --

18         A    It's a narcotic drug.

19         Q    Is that the same as the Contin that

20    you were using before?

21         A    No.  It's in the same family of

22    drugs.

23         Q    In the morphine family of drugs?

24         A    It's a narcotic drug.

25         Q    What do you mean by 20 milligrams

39

                              Haimovic

1

2    BID?

3         A      Twice a day.

4         Q      Is Effexor also a narcotic drug?

5         A      No, it's an antidepressant.

6         Q      How much was she on at that point?

7         A      150 milligrams daily.

8         Q      What sort of drug is Soma?

9         A      It's a muscle relaxant.

10        Q      You also have a fourth impression.

11   What was that?

12        A      That she had persistent migraines.

13   That shows temporomandibular joint dysfunction.

14   That she has RSD in the right arm, and possibly

15   excessive sleepiness or sleep apnea secondary to

16   medication.

17        Q      What is sleep apnea?

18        A      It's a disease where a patient has

19   impaired sleep and difficulties with breathing in

20   sleep.

21        Q      What was your plan of treatment at

22   that point?

23        A      Give her Robaxin, renewed the

24   Oxycontin and follow-up in six weeks.

25        Q      I notice in your neurological

40

                          Haimovic

1

2   examination, what did you note in particular in

3   right upper extremity on the right hand?

4        A     Diminished strength, slight swelling

5   in the right hand.  That's it.

6        Q     What is red edematous right hand?

7        A     Edematous, it means that it's

8   swollen, slightly swollen.

9        Q     Why red?  Is that a change in color?

10       A     Reddish in appearance, yes.

11       Q     So the hand had changed to a reddish

12  color?

13       A     Yes.

14                  MR. MARTIN:  Objection.

15                  Leading.

16       Q     Had you noticed whether there were

17  any changes in the hand, just in case his

18  objection is sustained?

19       A     Yes.

20       Q     What changes did you note?

21       A     That her hand was slightly swollen

22  and red.

23       Q     What was your plan after that visit

24  in February of 2001?

25       A     Robaxin.  Renewed the Oxycontin and

41

```
1                        Haimovic
2    return for follow-up in six weeks.
3         Q    What sort of a drug is Robaxin?
4         A    Muscle relaxant.
5         Q    Has Ms. Aponte visited with you
6    since that date?
7         A    Yes.
8         Q    I saw her again on February 14,
9    2002.
10                   MR. MARTIN:  I would request
11              that we go off the record, please.
12                   MR. FALZON:  Let me continue.
13                   MR. MARTIN:  I would request
14              that we go off the record.
15                   MR. FALZON:  I don't want to
16              go off the record.
17                   MR. MARTIN:  When one of us
18              requests that, that's what happens.
19                   MR. FALZON:  It has to be
20              agreed by both.
21                   MR. MARTIN:  All right.  Let's
22              stay on the record.
23                   Doctor, I would like a copy of
24              that report which has not been
25              produced to me before we continue so I
```

42

Haimovic

1        can have it in front of me.

2                In fairness, Tony, why don't

3        we go off the record and save

4        ourselves a little time, so I can have

5        the record in front of me.

6   BY MR. FALZON:

7        Q     Is that already in report form yet,

8   Doctor?

9        A     No.

10       Q     Do you have any notes from that?

11       A     Yes.

12       Q     Do you have them with you here

13  today?

14       A     Yes.

15       Q     And they have been marked as part of

16  the exhibit that's in front of you?

17               MR. MARTIN:  I would request

18       we make a copy of the notes so that I

19       can have them in front of me as you

20       examine the witness, if that's okay.

21               Can we go off the record for

22       that purpose?

23       Q     Is there a possibility of having

24  that copied?

43

Haimovic

```
 1
 2        A     Yes.
 3        Q     Let me ask you questions about it,
 4   then we can hand it to --
 5                    MR. MARTIN:  I would
 6              appreciate doing it right away, which
 7              is to let me see it as he is talking
 8              about it.
 9        Q     Doctor, can I see that particular
10   page in your notes?
11                    I am going to hand it over to
12   defense counsel to look at, then we will continue
13   with our examination.
14                    MR. MARTIN:  Why don't we go
15              off the video, please.
16                    MR. FALZON:  I really would
17              like to stay on the record.
18                    MR. MARTIN:  Okay.  The jury
19              will just sit here and listen, I
20              guess.
21   BY MR. FALZON:
22        Q     Do you recall off hand what her
23   complaints were?
24                    MR. MARTIN:  Give him a chance
25              to have this in front of him, please.
```

44

1                         Haimovic

2                         Okay.   Thank you.

3         A         Thank you.

4                   She complained of persistent burning

5    sensation in the right hand, weakness, jabbing

6    sensation, coldness, persistent pain in the jaw,

7    persistent headaches on the left side, persistent

8    use of medications, Imitrex, Oxycontin,

9    Wellbutrin, lorazepam.

10                  And the impression was she still has

11   RSD.   She suffers with migraines.

12        Q         On the basis of the history and

13   examinations of Ms. Aponte, have you reached a

14   definite diagnosis of her condition?

15        A         Yes, I believe she suffers with RSD,

16   she suffers from migraines and that she suffers

17   from temporomandibular joint dysfunction.

18        Q         Let me ask you a little more about

19   RSD, because I'm really trying hard to understand

20   this disease.

21                  MR. MARTIN:   Move to strike.

22        Q         Is it true that RSD burns itself

23   out?

24        A         It may or may not.

25        Q         Is it true that minor injuries

45

                          Haimovic

1

2     cannot cause RSD?

3            A      No.

4            Q      Is it true that pain is more severe

5     than that expected of the type of injury when you

6     get RSD?

7            A      Yes.

8                          MR. MARTIN:    Objection to the

9                   form.

10                         Hypothetical.   Predicate.

11           Q      Have you heard the expression

12    secondary gains?

13           A      Yes.

14           Q      What is your understanding of that

15    term?

16           A      Secondary gains are additional gains

17    that a person may have when they have certain

18    complaints.   So that they may be monetary, there

19    may be emotional gains, they may be control of the

20    environment.

21           Q      Some say that patients with RSD

22    continue to complain because of secondary gains,

23    that basically they are looking for sympathy and

24    are gaining satisfaction from their experience

25    with this disease.

46

                              Haimovic

1

2              Is that your experience with

3    patients with RSD as a general group?

4                    MR. MARTIN:  Objection.

5                    Form.

6         A    I cannot talk about things in

7    general.  I can talk about her.  I don't think

8    that's my experience with her.

9         Q    So Nanci Aponte does not show

10   secondary gains?

11                   MR. MARTIN:  Objection.

12                   Leading.

13        A    I don't believe that it's secondary

14   gains that's making her complain.

15        Q    Is it true that RSD occurs in

16   psychologically imbalanced people?

17        A    Not necessarily.

18        Q    Is that your experience with Nanci

19   Aponte, that she is psychologically imbalanced?

20        A    No.

21                   MR. MARTIN:  I object.

22                   Predicate.  Qualifications of

23            the witness.

24        Q    I'm sure you are going to be asked

25   this, so let me ask you this.

47

1            Haimovic

2            MR. MARTIN:  Move to strike.

3       Q    Did you need a thermographic study

4  to confirm your diagnosis of RSD?

5       A    No.

6       Q    Why not?

7       A    It's a clinical diagnosis.

8       Q    You also carried out a sympathetic

9  block of her, did you not?

10      A    I did not.

11      Q    Was she referred for a sympathetic

12 block?

13      A    Yes.

14      Q    That is a diagnostic test in itself,

15 is it not?

16           MR. MARTIN:  Objection.

17           Leading.

18      A    Not necessarily.

19      Q    But it can be diagnostic?

20      A    It could be.

21           MR. MARTIN:  Same objection.

22           Leading.

23      Q    What is a sympathetic block?

24      A    It is an injection of a local

25 anesthetic into the sympathetic, innervation of

48

1                          Haimovic

2       the arm.

3               Q       What is its diagnostic quality?

4               A       I'm not sure.

5               Q       You saw discoloration in her right

6       hand, did you not?

7               A       Yes.

8                       MR. MARTIN:  I object.

9                       Leading.

10              Q       That is an objective clinical

11      finding, is it not?

12                      MR. MARTIN:  Objection.

13                      Leading.

14              A       Yes.

15              Q       You tested her sensitivity with pin

16      pricks, did you not?

17              A       Yes.

18                      MR. MARTIN:  Objection.

19                      Leading.

20              Q       That's an objective finding, is it

21      not?

22                      MR. MARTIN:  Same.  Leading.

23              A       Not objective.  It's a subjective.

24              Q       Is there an objective component to

25      it?

49

Haimovic

1          A      I'm not sure.

2          Q      When you last examined Ms. Aponte,

did you come to an opinion based on a reasonable

degree of medical certainty whether the condition

you observed was temporary or permanent?

           A      I think that it's permanent.

           Q      What are the reasons for your

opinion?

           A      She had severe intractable pain for

over, the period of time that I have been taking

care of her, and she was not responding to

medications directly.

           Q      Do you have an opinion as to what

stage of RSD Ms. Aponte is suffering from?

           A      She is still not in the end stages.

There is no atrophy.  There is no atrophy of the

skin.  There is no profound discoloration.

There's some fluctuation in the color.  So I don't

think it's the end stages.

           Q      Would that be in the first stages of

RSD?

           A      First and second.

           Q      Is the condition that you have

diagnosed in Ms. Aponte capable of producing pain?

50

Haimovic

```
 1
 2        A      Yes.
 3        Q      Could you quantify the pain that she
 4   would be feeling?
 5        A      It's severe.
 6        Q      And is the pain that the patient is
 7   experiencing a temporary or a permanent condition?
 8        A      I believe it's permanent.
 9        Q      Do you have an opinion to a
10   reasonable degree of medical certainty whether
11   Nanci Aponte's injuries which you have described
12   and treated were caused by the incident of
13   February 1, 2000?
14                    MR. MARTIN:  Objection.
15                    Predicate.
16        A      Yes.
17        Q      What is your opinion?
18        A      That it was caused.
19        Q      Dr. Haimovic, did you submit a bill
20   for the professional services you rendered in this
21   case?
22        A      Yes.
23        Q      Do you know the amount of that bill?
24        A      No.
25        Q      Is it possible to get a copy of the
```

51

```
 1                        Haimovic
 2    bill?
 3            A      Maybe.
 4            Q      When the bill is produced, do you
 5    keep records, you keep billing records in your --
 6            A      Yes.
 7                   MR. FALZON:  Could I have that
 8                bill produced and marked as, I think
 9                we are on to Exhibit C.
10                   (Copy of bill was deemed
11                marked as Plaintiff's Exhibit C for
12                identification, as of this date.)
13                   MR. MARTIN:  Objection.
14    BY MR. FALZON:
15            Q      Do you know if the bill was paid?
16            A      No.
17            Q      Is it possible to get one of your
18    assistants to produce the bill, or is the bill in
19    your records there?
20            A      I mean I can ask them to do it.
21            Q      Have you been paid to testify here
22    today?
23            A      Yes.
24            Q      What is the amount that you are
25    being paid?
```

52

1                          Haimovic

2          A     I believe that by court order it's

3     $500 an hour.

4          Q     Do you know what Nanci Aponte's

5     occupation is?

6          A     No.

7          Q     If I told you she was a licensed

8     practical nurse, would it be your opinion that she

9     could work as a licensed practical nurse with that

10    condition?

11                    MR. MARTIN:  Objection.

12                    Form.  Predicate.

13         A     She would not be able to work.

14                    MR. FALZON:  Doctor, those are

15              all the questions I have for you.

16                    I would like to reserve the

17              introduce the bills into evidence, and

18              if you could ask your assistant to

19              produce them before Mr. Martin starts

20              his cross-examination.

21                    THE WITNESS:  I don't know if

22              they can do it now.

23                    MR. FALZON:  Could you find

24              out if they could?

25                    THE WITNESS:  I will go and

53

1                          Haimovic

2            check.

3                     MR. FALZON:  Let's go off the

4            record.

5                     MR. MARTIN:  I don't object.

6            That's okay.

7                     MR. FALZON:  You don't object

8            to the bills?

9                     MR. MARTIN:  I don't object to

10           going off the record.

11                    MR. FALZON:  Oh, all right.

12                    MR. MARTIN:  Unlike you.

13                    THE VIDEOGRAPHER:  Go off the

14           record.  The time is 8:08.

15                    (Discussion off the record.)

16                    THE VIDEOGRAPHER:  Back on the

17           record.  The time is 8:09.

18   I T Z H A K   C.   H A I M O V I C, resumed and

19           testified further as follows:

20   CROSS-EXAMINATION

21   BY MR. MARTIN:

22           Q    Good morning, Doctor.  I represent

23   the defendants.  I am Bill Martin.  I will be

24   asking you some questions.

25                    There is no recognized specialty in

54

1                       Haimovic

2      neurology for the treatment of RSD, isn't there?

3           A      Correct.

4           Q      You don't hold yourself out as

5      having any specialty or subspecialty in the

6      treatment of reflex sympathetic dystrophy, do you?

7           A      Correct.

8           Q      When you first examined Nanci

9      Aponte, what was the measurement of her forearms?

10          A      I didn't measure it.

11          Q      How do you know there was no

12     atrophy?

13          A      By sight.

14          Q      Isn't that part of a complete

15     neurological examination of a patient who comes in

16     with RSD?

17          A      No.

18          Q      Did you ever measure her forearms,

19     Doctor?

20          A      I don't do measurements.

21          Q      Can disuse of a limb produce atrophy

22     over time?

23          A      It may or may not.

24          Q      So it may have produced atrophy in a

25     patient such as Nanci Aponte who claims that she

```
 1                         Haimovic
 2     has hardly used her right hand at all for over two
 3     years, isn't that so?
 4           A     I didn't see any evidence of atrophy
 5     by sight.
 6           Q     So her right forearm -- by the way,
 7     which hand was her dominant hand?
 8           A     I don't remember if it is in the
 9     chart.
10           Q     Do you know whether this patient
11     ever wore a splint to come in and see you?
12           A     I don't think she ever did.
13           Q     The discoloration that you testified
14     about on direct examination, you only saw that
15     once, correct?
16           A     Correct.
17           Q     Do you know whether just before she
18     came in that day she had a splint on that may have
19     been too tight that may have produced some
20     circulatory problems or discoloration?
21           A     No.  There were no marks.
22           Q     Do you know whether a splint that
23     may have been too tight may have produced an
24     edematous or reddish appearance?
25           A     There were no marks.
```

56

                              Haimovic

1

2          Q      If a splint was too tight or if a

3    patient had some constriction, those finds could

4    result, could they not?

5                     MR. FALZON:   Objection.

6                     Form.

7          A      There would have been marks.

8          Q      In terms of her nails, did you ever

9    notice anything about her nails?

10         A      They were normal.

11         Q      In terms of these changes that we

12   are talking about, whether we are talking about

13   hair, changes of nails, those are called trophic

14   changes, right?

15         A      Correct.

16         Q      They include, by the way, hair loss?

17         A      Correct.

18         Q      You never noticed any hair loss from

19   one extremity to the other, did you?

20         A      Correct.

21         Q      You never noticed any abnormal

22   growth patterns of hair?

23                     MR. MARTIN:   Off the record.

24                     THE VIDEOGRAPHER:   Off the

25                     record.   The time is 8:11.

57

```
 1                    Haimovic
 2              (Discussion off the record.)
 3              THE VIDEOGRAPHER:  Back on the
 4         record.  The time is 8:11.
 5
 6    BY MR. MARTIN:
 7         Q     You never noticed any loss of hair
 8    in Nanci Aponte, did you?
 9         A     Correct.
10         Q     You never noticed any abnormal hair
11    growth patterns, did you?
12         A     Correct.
13         Q     And those things that I have
14    discussed, those trophic changes, they could
15    characteristic of RSD; isn't that so?
16         A     Correct.
17         Q     You didn't notice any difference in
18    perspiration between one side and the other, did
19    you?
20         A     Correct.
21         Q     In fact, you noted once that her
22    hand looked waxy and cold.  And in a year of
23    treatment, that's the only time you made
24    observation of that in your records, right?
25         A     Correct.
```

58

Haimovic

1

2     Q    Now, RSD doesn't spread, does it?

3     A    Correct.

4     Q    She reported that she had numbness

5 and also hypersensitivity at the same time in her

6 right hand, didn't she?

7     A    You mean the left hand?

8     Q    No, I mean the right hand.  Which

9 hand was involved?

10    A    The right hand.

11    Q    She reported that she had allodynia

12 and hypesthesia in the right hand, did she not?

13    A    Correct.

14    Q    And at the same time she was

15 reporting and you were finding diminished pin

16 prick sensation in the her fingertips, she was

17 also reporting this exquisite sensitivity; that's

18 the allodynia, isn't that so?

19    A    Yes.

20    Q    So you had numbness and you have

21 hypersensitivity in the same patient in the same

22 hand, correct?

23    A    Correct.

24    Q    Although RSD doesn't spread, first

25 she came in and she had problems that were limited

59

```
 1                         Haimovic
 2     to her hand, correct?
 3          A      Correct.
 4          Q      And then as time progressed, in
 5     fact, doesn't she have complaints referable to her
 6     entire arm?
 7          A      Correct.
 8          Q      You never did a three-phase bone
 9     scan on this patient, did you?
10          A      I don't remember doing that.
11          Q      Well, if you did, your records would
12     reflect it, correct?
13          A      Yes.
14          Q      And they don't, do they?
15          A      Correct.
16          Q      Not only do you write down pertinent
17     relevant positive information, but you actually
18     underline it in your chart, correct?
19          A      Yes.
20          Q      And most of what you have written
21     from examination to examination, and I'm not being
22     critical of this, I am just asking you, is the
23     complaints that the patient made to you, correct?
24                     MR. FALZON:  Objection.  Form.
25          A      And the findings and the treatment.
```

60

Haimovic

1    Q    And many of those complaints are

2    subjective necessarily in nature, you believe what

3    your patient tells you, you write it down as part

4    of her subjective presentation; correct?

5              MR. FALZON:   Objection to

6              form.

7    A    Correct.

8    Q    Now, RSD has many different

9    symptoms, doesn't it?

10    A    Correct.

11    Q    As you testified on direct, it might

12    ultimately involve the bones?

13    A    Might.

14    Q    It might involve the muscles,

15    correct?

16    A    It might.

17    Q    Might involve the skin, correct?

18    A    It might.

19    Q    There were no positive objective

20    findings indicating that this complaint of RSD by

21    Nanci Aponte involved her bones, was there?

22    A    Correct.

23    Q    And in terms of muscles, basically

24    she reported and exhibited what you would have to

61

1                           Haimovic

2      agree was subjective weakness or complaints of

3      pain when you tried to test her muscles, isn't

4      that correct?

5                      MR. FALZON:   Objection.   Form.

6           A      I don't think he pain was subjective

7      weakness, I think her pain was real.

8           Q      You don't think perhaps from time to

9      time maybe she just wasn't trying hard enough?

10                     MR. FALZON:   Objection to the

11                form.

12          A      I think I can distinguish between

13     the two.

14          Q      Okay.  And RSD, I know you talked

15     about stages.

16                 What type of complex regional pain

17     syndrome did this patient exhibit?

18          A      Basically the ones that involve

19     severe pain, allodynia, dysesthesia.

20          Q      What clinical category is that?  Is

21     that type one, type two, some other type?

22          A      I think it's basically the earlier

23     stages.

24          Q      Now, there is a difference, isn't

25     there, between the type or the categorization of

62

1                          Haimovic

2      RSD and the stages.

3           A     Let me put it this way.  There are

4      as many opinions about RSD as there are probably

5      doctors who take care of RSD.  So we cannot talk

6      in terms of definitive terms.

7                We know that the condition exists

8      where there is severe, intractable pain in a

9      patient that sustained either a major or minor

10     trauma, that the pain is intractable, it's

11     irreversible, it requires significant amount of

12     treatment.

13                But when you talk about stages, when

14     you talk about tests as if it's truth from Sinai,

15     as if it's scientifically the only method of

16     looking at things, it's totally incorrect.

17                So when you are asking me to

18     specifically categorize this into a box, you are

19     not correct, because there are many ways of

20     looking at the condition.

21                What we do now is what I have just

22     said.

23           Q     Doctor, it's a tough and complicated

24     and multi-symptomatic condition that is difficult

25     and controversial to diagnose, isn't it?

63

                              Haimovic

1

2         A      Yes.

3         Q      And one of the unusual things about

4    this among people who think that it is a

5    legitimate disease entity is that very often a

6    trivial stimuli such as you have talked about, a

7    minor accident, is said to produce symptoms wholly

8    out of proportion to what one would reasonably

9    expect; isn't that so?

10        A      Yes.

11        Q      Now, tell us how severe was the

12   motor accident in which your patient was involved.

13                    MR. FALZON:  Objection.

14                    Form.

15        A      I was not there, I'm not privy to

16   the exact forces of impact.  I know that she was

17   in an accident.

18        Q      Was she seat belted?

19                    MR. FALZON:  Objection to the

20             form.

21        A      I don't remember.

22        Q      Did she hit her head?

23                    MR. FALZON:  Objection.  Form.

24        A      I don't think so.

25        Q      What is concussion, Doctor?

64

1                    Haimovic

2           A     It's a transient, either a transient

3     loss of consciousness or persistent pain

4     associated with cognitive disturbances and

5     difficulties with concentration after an accident.

6           Q     Does it require one to hit one's

7     head?

8           A     No.

9           Q     Do you know whether she hit her

10    head?

11          A     I don't think she did.

12          Q     Do you know whether she sustained

13    any facial cranial trauma, in other words, trauma

14    to her jaw or face?

15          A     I don't know.

16          Q     Would that be relevant to you in

17    terms of TMJ and her jaw complaints?

18          A     I'm not a TMJ specialist.

19          Q     You didn't treat her for TMJ, did

20    you?

21          A     No.

22          Q     You just sent her for MRI of her TMJ

23    because she had jaw complaints?

24          A     Correct.

25          Q     And these jaw complaints for the

65

1                          Haimovic

2    first time, and I will represent to you that the

3    reference in your record is the first reference

4    following this accident of jaw complaints, would

5    you agree with me they occurred, if this accident

6    was February 1, 2000, that the first jaw complaint

7    is in your office note dated March 2, 2000, a

8    month post accident?

9                     MR. FALZON:  Objection.

10                    Form.

11        A     From my recollection, yes.

12        Q     And before that she didn't have any

13   complaints referable to her jaw, did she?

14                    MR. FALZON:  Objection.

15        A     From my recollection, yes.

16        Q     And you, as a good neurologist, you

17   said let's get her an MRI and see where are with

18   this jaw complaint, correct?

19                    MR. FALZON:  Objection.

20                    Form.

21        A     I probably took a look, yes.

22        Q     And you haven't seen the films, have

23   you?

24        A     I don't remember.

25        Q     You relied on the neuroradiologist,

66

1                         Haimovic

2    Dr. Richard Silvergleid --

3         A    Right.

4         Q    -- and he read the films?

5         A    Correct.

6         Q    So your reliance upon that report is

7    only as accurate as his ability to read those

8    films?

9         A    Yes, which is excellent.

10        Q    Well, do you know the quality of the

11   films?

12        A    Yes.

13        Q    How do you know, if you haven't seen

14   them?

15        A    Because I know the machine that

16   produces them.

17        Q    What if there is motion artifact on

18   the films, do you know whether that happened in

19   this case?

20        A    Then it would be stated on the

21   report.

22        Q    So you are relying on him but you

23   haven't seen the film?

24        A    A hundred percent.

25             I have been relying on him for 20

67

1                          Haimovic

2     years.  I have a close relationship with him.  He

3     reads the majority of my studies.  He is a first

4     rate, highly trained, excellent neuroradiologist.

5             Q     So you would also rely on his

6     reading of the MRI of the brain, correct?

7             A     Yes, totally.

8             Q     What was that done for, the MRI --

9             A     To make sure that there was no blood

10    clot on the surface of the brain.

11            Q     As a competent neuroradiologist such

12    as Dr. Silvergleid reads that MRI actual film, he

13    is looking for any other abnormalities, correct;

14    anything else that is significant he will report

15    to you?

16            A     Yes.

17                      MR. FALZON:  Objection to the

18            form.

19            Q     And he didn't find anything at all,

20    did he?

21            A     Correct.

22            Q     And, likewise, because the patient

23    came in with neck complaints, you had Dr.

24    Silvergleid perform an MRI of this lady's cervical

25    spine?

68

1                          Haimovic

2          A      Correct.

3          Q      And the MRI of the cervical spine

4    would look for what, please?

5          A      Disk herniations, dislocations,

6    fractures.

7          Q      And she didn't have any of that, did

8    she?

9          A      Correct.

10         Q      And, in fact, you, in April you did

11   some EMG testing?

12         A      Correct.

13         Q      What is EMG testing?

14         A      It's an electrical test where we

15   stimulate the nerves and measure their responses.

16         Q      Is that the same or different than

17   nerve conduction tests?

18         A      That's nerve conduction.  The EMG is

19   placing a needle in the muscle and looking at the

20   pattern of response of the muscle.

21         Q      As far as this patient, Nanci

22   Aponte, you tested her motor nerves by nerve

23   conduction, correct?

24         A      Correct.

25         Q      You tested her right median, right

69

                              Haimovic

1

2      ulnar and right radial nerve, isn't that so?

3           A      Yes.

4           Q      All the results were normal,

5      correct?

6           A      Correct.

7           Q      What does that indicate?

8           A      That it's normal.

9           Q      That if she has no problems in any

10     of those nerves, that you can objectively measure

11     by that test?

12          A      That it's normal.

13          Q      And you tested her sensory nerves

14     also that right extremity, correct?

15          A      Correct.

16          Q      And the right median, right ulnar

17     and right radial nerve tests for the sensory

18     nerves, they were normal as well, weren't they?

19          A      Yes.

20          Q      When it says F/H report, what is

21     that on your test?

22          A      F waves and H waves.

23          Q      That's another way of testing that

24     right median and right ulnar nerve?

25          A      Yes.

70

1                         Haimovic

2          Q      And those results were normal as

3    well, correct?

4          A      Yes.

5          Q      These are objective tests, aren't

6    they?

7          A      Correct.

8          Q      And they measure that

9    electromyography, the electrical conduction

10   abilities of those nerves?

11         A      They measure conduction velocity,

12   yes.

13         Q      And then you also have a separate

14   EMG report our EMG testing, correct?

15         A      Yes.

16         Q      What does EMG stand for?

17         A      Electromyography.

18         Q      And you tested one without reading

19   them, two, three, four, five, six, about seven

20   muscles, including biceps, triceps, pronators,

21   cervical muscles, correct, and every one of these

22   results was normal, was it not?

23         A      Yes.

24         Q      With respect to secondary gain that

25   we talked about, have you heard secondary gain

71

                              Haimovic

1

2     discussed in the context of plaintiffs in

3     litigation?

4          A     I don't know what you mean.

5          Q     Well, certainly secondary gain is

6     some gain outside going to a doctor for treatment

7     that people may get from having a problem, a

8     medical problem, such as attention, as Mr. Falzon

9     referred to, isn't that so?

10                    MR. FALZON:   Objection.

11                    Form.

12         A     Okay.

13         Q     Would you agree?

14         A     Would I agree with what?

15         Q     What is secondary gain, Doctor?

16                    MR. FALZON:   Objection.   Form

17         A     This was answered already.

18         Q     Right.   It's what he said, it's

19    something outside the normal healing process or

20    reason that someone might go to a doctor?

21                    MR. FALZON:   Objection to the

22              form.

23         Q     Do people involved in litigation

24    sometimes have a secondary gain factor going on?

25         A     It's certainly possible.

72

1                          Haimovic

2          Q     Is it fair to say that a high

3     percentage of patients who complain of reflex

4     sympathetic dystrophy are plaintiffs in personal

5     injury litigation?

6                    MR. FALZON:   Objection.

7                    Form.

8          A     I have not looked at the numbers.   I

9     don't know the statistics.

10         Q     Doctor, have you been deposed in

11    another RSD case involving a patient of yours?

12         A     Yes.

13         Q     In terms of testing her memory and

14    impairment, what did you do?

15         A     I asked her recent facts, dates.

16         Q     Do you know that she had any

17    problems that resulted from those tests, in other

18    words, any abnormality?

19                    MR. FALZON:   Objection to the

20             form.

21         A     I don't recall being personally

22    impressed that her memory was grossly impaired.

23         Q     When you are interested in a

24    patient's history, are you also interested in the

25    history that may have preceded the event the

73

Haimovic

1  patient tells you about, such as a car accident?

2              In other words, if she tells you she

3  has been in this car accident, might you be

4  interested in previous car accidents?

5                    MR. FALZON:  Objection.

6                    Form.

7        A     There is no prior history, but if

8  there was a history, I would like to hear about

9  it, yes.

10       Q     You only know that if she tells you

11 about it; correct?

12       A     Yes.

13       Q     Do you know whether this patient was

14 ever in prior accidents?

15       A     Not to my recollection.

16                    MR. FALZON:  Objection.

17       Q     Now, in terms of this concussion

18 syndrome, very often that resolves over time,

19 doesn't it?

20       A     Yes.

21       Q     At the end she was complaining of

22 migraine headaches, correct?

23       A     Correct.

24       Q     At the beginning you didn't note

74

Haimovic

1   that the headaches were migrainous in character,

2   did you?

3   A       Correct.

4   Q       It was only when she came in after

5   month and months and said, "I'm vomiting, I'm

6   nauseous, I get an aura," that's when you

7   associated those complaints with migraine

8   headaches, correct?

9                    MR. FALZON:   Objection.

10                   Form.

11  A       Correct.

12  Q       Now, of the medications that you

13  gave her, tell the jury how many of those are

14  narcotics, strong acting narcotics?

15  A       One.

16  Q       Which?

17  A       Oxycontin.

18  Q       How many of those are

19  antidepressants?

20  A       One or two, I think, the Pamelor and

21  the Effexor.

22  Q       What medications were other health

23  care providers giving to Nanci Aponte at the same

24  time you were giving these medications to her?

75

Haimovic

1

2      A     She was getting Effexor at one

3  point, she was getting Neurontin, she was taking

4  Gabitril, Robaxin.

5      Q     Is Neurontin strong?

6      A     Yes.

7      Q     How does that act?

8      A     It acts centrally on the central

9  nervous system.

10     Q     The EEG that tested her what,

11  please?

12     A     Brain wave activity.

13     Q     And that was entirely normal, was it

14  not?

15     A     Yes.

16     Q     Now, in terms of her diminished

17  sensation to pin prick, what you do is you take a

18  very gentle stimulus like a pin prick, and you ask

19  the patient to tell you what, her sensation?

20     A     Yes.

21     Q     And to the extent that the patient

22  responds to you, that's a subjective response on

23  the patient's part, isn't that so?

24     A     Yes.

25     Q     Subjectively she told you she had

76

1                              Haimovic

2     marked tenderness to touch, correct?

3          A      Correct.

4          Q      And that allodynia is an unusual

5     finding, because even wind blowing by a patient's

6     hand can produce pain, correct?

7          A      Correct.

8          Q      In terms of use of her right hand,

9     tell the jury what use she did have, if any, of

10    her right hand or over time whether she couldn't

11    use it?

12         A      She was not using it much.

13         Q      She told you that she used it little

14    or none, didn't she?

15         A      Whatever the notes reflect.

16         Q      Well, the notes don't reflect that,

17    that's what I'm saying.

18         A      She had a lot of pain in the arm.

19    She implied that she was not using it as much.

20         Q      And those complaints of weakness and

21    pain were also at least to some extent subjective

22    on the part of the patient, correct?

23                        MR. FALZON:  Objection.

24                        Form.

25         A      Yes.

77

Haimovic

1

2    Q    And you diagnosed RSD basically as a

3    result of her complaints of severe unrelenting

4    pain, did you not?

5    A    Yes.  And also at times

6    discoloration and at times swelling.

7    Q    Well, frankly, you noted

8    discoloration only once, isn't that so?

9    A    I didn't count.

10   Q    Well, if I told you that your notes

11   only have that finding in them once, would you

12   disagree with me?

13              MR. FALZON:  Objection to the

14        form.

15   A    I don't know.  I would have to look,

16   but it sounds reasonable.

17   Q    Now, I asked you about narcotics,

18   and you mentioned Oxycontin, correct?

19   A    Yes.

20   Q    I thought you said that Gabitril was

21   a narcotic?

22   A    Yes.

23   Q    Forgive me, maybe I had it wrong in

24   my notes.

25              This dysesthesia, that's the

78

Haimovic

1

2      abnormal sensation that you are talking about?

3          A       Yes.

4          Q       That's a burning and sensitivity?

5          A       Yes.

6          Q       Now, that originally she complained

7      of where, in her hand?

8          A       Yes.

9          Q       And it spread to her arm, didn't it?

10         A       Mostly in the hand.

11         Q       The Pamelor, that was the

12     antidepressant?

13         A       Yes.

14         Q       With reference to the questions that

15     were asked of you regarding her September 7th

16     visit, I think you said that there was no

17     particular distribution of her pain in her hand.

18     I don't want to misquote you.

19                 Is that fair to say?

20         A       Say that again.

21         Q       Was there a particular anatomic

22     distribution of her complaints of hand pain?

23                 MR. FALZON:  Objection.

24                 Form.

25         A       No.

79

Haimovic

1     

2        Q    What do we mean when we talk about a

3    particular anatomic distribution?

4        A    Painful distribution.

5        Q    What meaning does that mean to you

6    as a neurologist?

7        A    It's in the distribution of a

8    particular nerve.

9        Q    And that was not demonstrated here

10   in her complaints, correct?

11       A    Correct.

12       Q    Did you know what to make of her

13   complaints of diminished sensation on the left

14   tongue?

15       A    No.

16       Q    Do you know whether she ever told

17   the doctor who was treating her for the TMJ about

18   that?

19           MR. FALZON:  Objection to the

20      form.

21       A    I'm not sure.

22       Q    You talked about giving her morphine

23   or some medication that started with MS?

24       A    Morphine sulfate, MS Contin.

25       Q    MS Contin?

80

1                           Haimovic

2          A     Yes.

3          Q     Is that a narcotic?

4          A     Yes.

5          Q     Is that different from Oxycontin?

6          A     Yes.

7          Q     So she was on at least two

8     narcotics?

9          A     Not at the same time.

10         Q     Okay.  I'm not asking the same time,

11    I'm asking in total, how many different narcotic

12    medications did you prescribe for this patient?

13         A     At least two.

14         Q     Did she report that any gentle touch

15    would cause her to experience excruciating pain in

16    her arm?

17         A     Yes.

18         Q     That's characteristic of this RSD,

19    is it not?

20         A     Yes.

21         Q     How about the diminished pin prick

22    sensation in her fingertips, that you were able to

23    through subjective testing, she told you about

24    that as well?

25         A     Yes.

81

1                          Haimovic

2          Q      Maybe I asked you, forgive me, but

3    did this patient sustain a head injury?

4          A      I don't remember.

5          Q      Now, you gave her Trileptyl I think

6    it was?  Maybe I am pronouncing it wrong.

7          A      Imitrex.

8          Q      No.  Well, we talked about Imitrex,

9    but there was an anti-seizure medication?

10         A      Trileptyl.

11         Q      Trileptyl.  Do you know whether she

12   was allergic to any anti-seizure medications?

13         A      Yes.  She was allergic to Gabitril,

14   Trileptyl and Neurontin.

15         Q      So you tried them, but they didn't

16   work?

17         A      Correct.

18         Q      Did you ever measure her range of

19   motion in her neck?

20         A      Yes.

21         Q      How much of a restriction did she

22   show?

23         A      Moderate.

24         Q      How did you measure it, did you use

25   a goniometer?

82

                                Haimovic

    A       No.

    Q       You just did it by looking at her
and judging where --

    A       Correct.

    Q       -- her restriction was in comparison
to what you would anticipate would be a full range
of motion?

    A       Correct.

    Q       You never did actually measure it,
did you?

    A       I don't have to.

    Q       And you never made a notation of how
much of a restriction she had?

    A       Not to any degree.

    Q       Doctor, you don't know whether she
had prior neck problems, do you?

    A       Not to my knowledge.

    Q       When you say that her hand was cool
and her skin was waxy, you found that once,
correct?

    A       Correct.

    Q       You saw her how many times, 10 or 12
or 15 as we have gone through?

    A       Between eight and 10.

83

1                          Haimovic

2          Q      You never prescribed a brace for

3    her, did you?

4          A      Correct.

5          Q      You never prescribed a splint to

6    her, did you?

7          A      Correct.

8          Q      Do you know whether she had ever had

9    problems with migraine headaches before she came

10   to see you?

11         A      Not to my knowledge.

12         Q      Do you know whether she had any

13   problems with headaches before she came to see

14   you?

15         A      Not to my knowledge.

16         Q      Now, you saw her just yesterday,

17   isn't that so?

18         A      Correct.

19         Q      Today is February 15, 2002, and you

20   saw her February 14th, and that's the visit for

21   which you haven't had a chance to have your office

22   notes typed up yet?

23         A      Correct.

24         Q      When was the time that you saw her

25   prior to yesterday?

84

Haimovic

1                                             

2        A      About a year ago.

3        Q      And do you know that she has been

4  treating with Dr. Hainline for that period of

5  time?

6        A      I thought she mentioned it

7  yesterday.

8        Q      So how was it that you came to see

9  her yesterday?

10       A      I have no idea.

11       Q      Did she call to make an appointment?

12       A      Yes.

13       Q      Did her lawyer send her to you?

14       A      I don't know.

15              MR. FALZON:  Objection.

16              Form.

17       Q      Do you know whether you were seeing

18  her or whether you were asked to see her so that

19  you could testify today at this deposition?

20       A      I don't know.

21       Q      You are not really a regular

22  treating physician of hers any more, are you?

23              MR. FALZON:  Objection to the

24          form.

25       Q      In the sense that she has had

85

1                           Haimovic

2      regular treatment, I will ask you to assume that,

3      and you have not seen her until yesterday for

4      what, about a year, February 1, 2001 until

5      February 14, 2002, isn't that so?

6              A      Okay, yes.

7              Q      You don't know her subsequent

8      intervening course, do you?

9              A      Correct.

10             Q      At the beginning I think while you

11     were being qualified, you were asked whether you

12     were a psychologist or psychiatrist or had any

13     specialty in that area and you frankly told us no,

14     correct?

15             A      Correct.

16             Q      So in terms of secondary gain or

17     emotional or psychological factors, you would

18     defer to someone in that specialty, wouldn't you?

19                     MR. FALZON:   Objection to the

20             form.

21             A      Correct.

22             Q      You wouldn't offer an opinions as to

23     whether this woman is emotionally involved or

24     whether that's a factor in the RSD or whether it's

25     not, would you?

```
 1                        Haimovic
 2           A      Correct.
 3           Q      In terms of her personal status, her
 4   social status, her occupational status,
 5   vocational, her marital status, how she does from
 6   day to day, you don't know much about that, do
 7   you?
 8           A      Correct.
 9           Q      In fact, you don't even know whether
10   she is working now, do you?
11           A      To my knowledge, she is not.
12           Q      Do you know -- well, I guess,
13   obviously, you are here, so you know she is
14   involved in litigation because that's typically
15   when we take depositions, right?
16           A      Right.
17           Q      Do you know anything about this
18   litigation?
19                        MR. FALZON:  Objection to the
20               form.
21           A      No.
22           Q      The sympathetic block, you said you
23   are not sure whether that's diagnostic or not,
24   correct?
25           A      Correct.
```

87

Haimovic

1                    

2        Q     Have you reviewed Dr. Hainline's

3 records?

4        A     No.

5        Q     Has this woman had surgery?

6        A     For reflex sympathetic dystrophy,

7 not to my knowledge.

8        Q     Do you know whether she sustained

9 any orthopedic injury in the accident?

10       A     Her wrist was fractured.

11       Q     What was fractured?

12       A     Which bone, I don't know.

13       Q     When you say that the amount of your

14 deposition fee was set by court order, do you know

15 what was your intention to charge originally for

16 this deposition?

17              MR. FALZON:  Objection to

18          form.

19              Move to strike.

20       Q     You can answer.

21       A     The standard fee for a deposition is

22 $6,000.

23       Q     That $6,000 is what you normally

24 charge for a deposition?

25       A     Yes, sir.

88

Haimovic

1

2      Q     Does it matter whether it takes ten

3   minutes or whether it takes an entire day?

4      A     I have never had a deposition for

5   ten minutes, have you?

6      Q     Yes, I have had them for less, but I

7   get to ask the questions.

8      A     Good.

9      Q     And the court said you ought to

10  charge less in this case?

11     A     That's my recall, yes.

12               MR. FALZON:  Objection.

13               I move to strike.

14     Q     Beyond what you have testified so

15  far, what other objective tests have you done to

16  test this lady's RSD or see whether she had it?

17     A     None to my knowledge.

18     Q     Or don't you need to do any?

19     A     I don't feel I have to do any.

20     Q     When was the last full neurological

21  exam you performed on this patient?

22     A     As the notes indicate.

23     Q     Was that a complete neurologic exam?

24     A     It's here.

25     Q     Admittedly, Doctor, some of your

89

                                    Haimovic

1

2    exams were not complete, correct?

3         A    I don't know what you mean by not

4    complete.

5         Q    Well, when a patient comes in for an

6    update, and I'm not being critical here, you don't

7    necessarily need to start from scratch and examine

8    everything every visit, do you?

9         A    Most of the time I do.

10        Q    Sometimes you just have a one-line

11   report, isn't that so?

12                   MR. FALZON:  Objection to he

13             form.

14        A    I'm sorry?

15        Q    Well, sometimes in your notes, let's

16   look, for example, at your office visit of, let's

17   just take July 6th, your neurologic exam is

18   written in two and a half lines, correct?

19        A    July 6th?  What is incomplete about

20   this?

21        Q    My question is whether your

22   neurologic examination is discussed in two and a

23   half lines?

24        A    Yes, because everything is normal.

25        Q    Your entire neurological examination

90

Haimovic

1    was normal, so it didn't take you long, correct?

2           A     Well, it it's normal, it's normal.

3    I don't have to specify.  If I say cranial nerves

4    normal, means that all 12 cranial nerves are

5    normal.

6           Q     Sure, because you write down any

7    abnormalities, right?

8           A     Correct.

9           Q     Likewise September 7th, let's take

10   that.  Your neurological examination was also

11   covered in two and a half lines in your report,

12   isn't that so?

13          A     Yes.

14          Q     That's different than the longer

15   reports that counsel referenced say for November

16   20th where you go onto a second page, correct?

17          A     Where I go to what?

18          Q     A second page of description in

19   terms of patient's symptoms.

20          A     What do you mean by a second page?

21          Q     Some reports are longer than others,

22   correct?

23          A     That's correct.

24          Q     Your first report, for example, when

91

                                    Haimovic

1

2    you first saw her on March 2 -- I'm sorry,

3    February 16th, that's two full pages, correct?

4          A      Oh, that's initial consultation,

5    yes.

6          Q      So that would be longer.

7                 As we go along, what I am saying is

8    sometimes you don't need to do a complete exam or,

9    on the other hand, you might have a shorter report

10   because your exam is normal, correct?

11         A      Correct.

12         Q      Has this lady benefited from your

13   treatment?

14         A      No.

15         Q      Does wind hurt her right hand?

16         A      Yes.

17         Q      Would submerging in say warm water

18   hurt her right hand?

19         A      I didn't ask her.

20         Q      Would light contact with a surface

21   or a doorknob, would that hurt her right hand?

22         A      Yes.

23         Q      You wouldn't expect that she would

24   be able to groom herself with her right hand very

25   well?

92

1          Haimovic

2              MR. FALZON:  Objection to the

3      form.

4      A     Pardon me?

5      Q     To hold an object such as holding a

6   toothbrush or hairbrush or a comb, that would hurt

7   her?

8              MR. FALZON:  Objection to the

9      form.

10     A     It would probably be uncomfortable.

11     Q     Touching a steering wheel or turning

12   hand over hand, that would hurt like heck,

13   wouldn't it?

14             MR. FALZON:  Objection to the

15     form.

16     A     It might.

17     Q     And carrying an object or carrying a

18   weight, would that bother her?

19     A     It might.

20     Q     How about if she were say to walk a

21   dog on a leash and get yanked using her right

22   hand, would you expect --

23             MR. FALZON:  Objection to the

24     form.

25             MR. MARTIN:  Please let me get

93

                                Haimovic
1
2            the question out.

3        Q       How about walking a dog on a leash

4    with her right hand, would you expect that might

5    hurt her if the dog was pulling?

6                    MR. FALZON:   Objection to the

7            form.

8        A       It might.

9        Q       How about if the dog yanked at that

10   leash, would that hurt her?

11                   MR. FALZON:   Objection to the

12           form.

13       A       It might.

14       Q       Just let me get it without the

15   objection in case we need to edit the video.

16               If she was walking her dog with a

17   leash in her right hand and the dog jerked her,

18   might that hurt her?

19       A       Yes.

20       Q       You would expect her to avoid these

21   activities, correct?

22                   MR. FALZON:   Objection to the

23           form.

24       A       Yes.

25       Q       What other activities would you

94

```
 1                    Haimovic
 2   expect her to avoid?
 3          A     Most activities that involved
 4   excessive movement of the right arm.
 5          Q     Including lifting?
 6                    MR. FALZON:  Objection to the
 7          form.
 8          A     It might, yes.
 9          Q     Carrying a package?
10                    MR. FALZON:  Objection to the
11          form.
12          A     It might.
13          Q     Opening a car door?
14                    MR. FALZON:  Objection to the
15          form.
16          A     It might.
17          Q     Putting a key in an ignition?
18                    MR. FALZON:  Objection to the
19          form.
20          A     It might.
21          Q     Did she have physical therapy?
22          A     I think at one point, yes.
23          Q     Did she work with weights?
24          A     Not to my knowledge.
25          Q     Do you know whether she bites her
```

95

1                          Haimovic

2     nails?

3          A     I don't think she does.

4          Q     That would hurt if she did it,

5     wouldn't it?

6          A     It might.

7          Q     You would expect her to avoid, as

8     most people do, activities that hurt her, isn't

9     that so?

10                    MR. FALZON:  Objection to the

11              form.

12         A     Yes.

13         Q     She can't even tolerate minimal

14    physical contact to her hand, can she?

15                    MR. FALZON:  Objection to the

16              form.

17         A     Right.

18         Q     That was the consistent nature of

19    her complaints to you from the beginning of the

20    time you began to suspect she had RSD all the way

21    until yesterday, the last time you saw her, isn't

22    that so?

23         A     Yes.

24         Q     Because that kind of contact for

25    her, for Nanci Aponte, is intolerably painful,

96

                              Haimovic

1

2    isn't it?

3                        MR. FALZON:   Objection to the

4              form.

5         A    Correct.

6         Q    Did you ever ask her whether she has

7    trouble writing?

8         A    No.

9         Q    You would expect that holding a pen

10   and applying pressure if she has this allodynia,

11   this hypersensitivity, that would cause her pain

12   as well and be uncomfortable for her, right?

13        A    It might.

14        Q    Why did you do an EMG test and a

15   nerve conduction study?

16        A    To know if there was any evidence of

17   nerve ending damage.

18        Q    Are there sometimes psychogenic or

19   psychological factors that do come into play in a

20   patient with reflex sympathy dystrophy?

21                        MR. FALZON:   Objection to the

22             form.

23        A    There may.

24        Q    What position, when you saw her, did

25   she hold her arm in?

97

1                          Haimovic

2          A      On her lap mostly.

3          Q      Was she guarding it?

4          A      Yes.

5          Q      Was she protective?

6          A      Yes.

7          Q      And she didn't want to be hurt by

8    being touched inadvertently?

9          A      Correct.

10         Q      Now, am I correct that the only time

11   you saw any edematous or swollen situation was the

12   one time that you reported it in your records?

13                MR. FALZON:   Objection.

14         A      Correct.

15         Q      And that was despite the many times

16   that you have seen her?

17         A      To my knowledge.

18         Q      Or the number of times you have seen

19   her, correct?

20         A      To my recollection, yes.

21         Q      Do you know whether there was any

22   damage to her vehicle in the accident?

23                MR. FALZON:   Objection to the

24           form.

25                Move to strike.

98

1                        Haimovic

2          A     No.

3                        MR. MARTIN:  He said it in the

4              middle of the question, so let me ask

5              just in case the objection is

6              overruled.

7          Q     Do you know whether there was any

8     damage to her car?

9          A     No.

10                        MR. FALZON:  Objection to the

11             form.

12         Q     Can she hold a phone?

13         A     I don't know.

14         Q     Did she complain of difficulty

15    talking to you?

16         A     No.

17         Q     Did you ever treat this patient for

18    any left-sided problems?

19         A     Not to my recollection.

20         Q     Did she ever complain of any

21    symptoms on the left side which you concluded were

22    indicative of carpal tunnel syndrome?

23         A     Not to my recollection.

24         Q     Did she ever complain about weakness

25    on the left side?

99

1                          Haimovic

2          A      Not to my recollection.

3          Q      Did she ever complain that her left

4    hand ached, that she couldn't do things with it?

5          A      Not to my recall.

6          Q      When you saw her yesterday, did she

7    complain that when she overused her left hand,

8    this would produce any problems?

9          A      Not to my recall.

10         Q      Did she ever complain of symptoms in

11   her shoulders?

12         A      Not to my recall.

13         Q      Did she ever complain of increased

14   hair growth on her upper extremities?

15                   MR. FALZON:   Objection to the

16              form.

17         A      Not to my recall.

18         Q      Did she ever complain of increased

19   perspiration or any of these trophic changes that

20   we have discussed?

21         A      Not to my recall.

22         Q      Did she ever exhibit any reflex

23   abnormality?

24         A      Pardon me?

25         Q      Did she ever exhibit any reflex

100

Haimovic

1      abnormality?

2               A       No.

3               Q       What is the organic structural

4      neurological damage that she sustained to her

5      peripheral nerves?

6               A       I don't know.

7                           MR. MARTIN:   Thanks, Doctor.

8                       That's all I have.

9                           MR. FALZON:   I have a few

10                      redirect questions.

11     REDIRECT EXAMINATION

12     BY MR. FALZON:

13              Q       Doctor, you brought in the bills

14     that I had asked be marked as Exhibit C.   What is

15     total of the charges?

16              A       I don't know.   You can review the

17     bill.

18              Q       Is there a total at the bottom?

19                      Does the bill that's being marked as

20     Exhibit C reflect the total of your professional

21     charges in this case?

22                          MR. MARTIN:   I would just note

23                      an objection to this.   It wasn't

24                      covered on during direct.

25

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

101

```
1                      Haimovic
2                MR. MARTIN:  I entered it on
3           direct.
4                MR. MARTIN:  Well, you
5           couldn't have entered it because I
6           wasn't in the room.
7      A     I don't think so.
8                All that it says here, I'm assuming
9  that it says that it was paid.
10     Q     Those were your professional
11 charges, correct?
12     A     Yes.
13     Q     Are those normal and customary
14 charges in the area of professional services at
15 the time?
16     A     Yes.
17     Q     Let me ask you a few more questions.
18                Are trophic changes noted in the
19 later stages of RSD more than in the earlier
20 stages?
21                MR. FALZON:   Objection.
22           Leading.
23     A     There may be.
24     Q     You were Nanci's treating physician
25 for RSD for over a year, were you not?
```

102

1                         Haimovic

2          A      Correct.

3          Q      You noticed numbness and

4     hypersensitivity, did you not?

5          A      Correct.

6                      MR. MARTIN:  Objection.

7                      Leading.

8          Q      Is a three-phase bone scan necessary

9     for diagnosis of RSD?

10         A      No.

11         Q      Did you make any objective findings

12    of RSD?

13         A      The allodynia I thought was fairly

14    objective.  And the edematous changes and the

15    changes in discoloration of the skin at times was

16    objective.

17         Q      Is the force of impact important for

18    a diagnosis of RSD?

19                     MR. MARTIN:  Objection.

20                Hypothetical.  Form.

21         A      No.

22         Q      You already testified that in your

23    opinion Nanci Aponte is not involved in secondary

24    gain, correct?

25                     MR. MARTIN:  Objection.

103

1                             Haimovic

2              Leading.

3        A        Correct.

4        Q        Would a minor car accident or car

5   accidents four or five years before the onset of

6   symptoms be relevant to your diagnosis?

7                    MR. MARTIN:   Objection.   Form.

8        A        I don't think so.

9        Q        Nanci Aponte complained from day one

10  of headaches, did she not?

11                   MR. MARTIN:   Objection.

12                   Leading.

13       A        To my knowledge, yes.

14       Q        And they were described by you as

15  intractable headaches, were they not?

16                   MR. MARTIN:   Same objection.

17       A        Correct.

18       Q        That was before she told you of

19  nausea or vomiting?

20                   MR. MARTIN:    Objection.

21       A        Correct.

22       Q        Is a secondary gain a psychological

23  condition?

24       A        I don't believe so.

25       Q        Now, you have admitted that as a

104

1                          Haimovic

2     neurologist you would not comment on a patient's

3     psychological condition; is that correct?

4          A     Yes.

5          Q     Would you be surprised if another

6     neurologist had made a diagnosis or observations

7     from a psychological standpoint?

8                    MR. MARTIN:  Objection.

9                    Calls for speculation.

10         A     No.

11         Q     Would that be standard for a

12    neurologist to make a psychological evaluation on

13    a patient?

14                   MR. MARTIN:  Objection.

15                   Predicate.

16         A     No.

17         Q     So that would surprise you?

18         A     No.

19                   MR. MARTIN:  Same objection.

20                   Leading.

21         Q     You stated when counsel was asking

22    you could she do this, could she do that, that she

23    might.  She might not be able to do it?

24         A     Correct.

25                   MR. MARTIN:  Objection.

105

```
                              Haimovic
 1
 2              Leading.
 3         Q     She also might be able to do it?
 4         A     Correct.
 5                   MR. MARTIN:  Objection.
 6                   Leading.
 7         Q     Your term was that it would be
 8    uncomfortable to do?
 9                   MR. MARTIN:  Objection.
10                   Leading.
11         A     Correct.
12         Q     Someone who was trying to get better
13    may try to do those things?
14                   MR. MARTIN:  Same objection.
15         A     Correct.
16         Q     You diagnosed the loss of sensation
17    in the fingertips, did you not?
18                   MR. MARTIN:  Objection.
19                   Leading.
20         A     Correct.
21         Q     What did you diagnose with regard to
22    the fingertips?
23         A     Numbness.
24         Q     So what would Nanci Aponte feel if
25    she bit her fingers?
```

106

```
  1                        Haimovic
  2        A     She might feel discomfort.
  3        Q     Would she be capable of carrying out
  4   limited physical activity with her right arm if it
  5   wasn't over an extended period of time?
  6        A     She might.
  7                    MR. FALZON:  Those are all the
  8              questions I have.
  9                    MR. MARTIN:  Nothing further.
 10                    THE VIDEOGRAPHER:  That
 11              concludes today's deposition.  The
 12              time is 8:49.
 13                    MR. MARTIN:  Read or waive,
 14              Doctor?
 15                    THE WITNESS:  I don't need to
 16              read it.
 17                    (Whereupon, at 8:49 o'clock
 18              a.m. the deposition was concluded.)
 19
 20
 21
 22
 23
 24
 25
```

107

1

2                              C A P T I O N

3

4        The Deposition of ITZHAK HAIMOVIC, taken in the

5        matter, on the date, and at the time and place set

6        out on the title page hereof.

7

8

9        It was requested that the deposition be taken by

10       the reporter and that same be reduced to

11       typewritten form.

12

13

14       It was agreed by and between counsel and the

15       parties that the Deponent will read and sign the

16       transcript of said deposition.

17

18

19

20

21

22

23

24

25

108

1

2                 C E R T I F I C A T E

3

4    STATE OF_____:

5    COUNTY/CITY OF_____:

6

7    Before me, this day, personally appeared

8    ITZHAK HAIMOVIC, who, being duly sworn, states

9    that the foregoing transcript of his/her

10   Deposition, taken in the matter, on the date, and

11   at the time and place set out on the title page

12   hereof, constitutes a true and accurate transcript

13   of said deposition.

14

15

16          _____

17                 ITZHAK HAIMOVIC

18

19   SUBSCRIBED and SWORN to before me this _____

20   day of _____, 2002, in the

21   jurisdiction aforesaid.

22

23

24   _____        _____

25   My Commission Expires           Notary Public


                        FINK & CARNEY
                 REPORTING AND VIDEO SERVICES
        39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

109

1

2                        DEPOSITION ERRATA SHEET

3       RE:
        FILE NO.
4       CASE CAPTION:   APONTE   vs. THE WEITZ COMPANY

5       DEPONENT:  ITZHAK C. HAIMOVIC
        DEPOSITION DATE:  2-15-2002
6
        To the Reporter:
7       I have read the entire transcript of my Deposition
        taken in the captioned matter or the same has been
8       read to me.  I request for the following changes
        be entered upon the record for the reasons
9       indicated.
        I have signed my name to the Errata Sheet and the
10      appropriate Certificate and authorize you to
        attach both to the original transcript.

11      _____

12      _____
        _____
13      _____
        _____
14      _____
        _____
15      _____
        _____
16      _____
        _____
17      _____
        _____
18      _____
        _____
19      _____
        _____
20      _____
        _____
21      _____
        _____
22      _____
        _____
23      _____

24      SIGNATURE:_____ DATE:_____

25            ITZHAK HAIMOVIC


                          FINK & CARNEY
                   REPORTING AND VIDEO SERVICES
        39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

110

```
 1

 2                          I N D E X

 3     Witness:              Direct Cross Redirect

 4     Itzhak C. Haimovic        3      53      100

 5
                              EXHIBITS
 6
       Plaintiff's      Description              Page
 7     (Deemed marked)

 8       A            Resume                      10

 9       B            Medical file                16

10       C            Bill for services           51

11

12     February 15, 2002
       New York, New York
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**FINK & CARNEY**
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

111

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK  )
                        ) ss.
4    COUNTY OF NEW YORK )

5              I, ANNETTE FORBES, a Certified

6              Shorthand (Stenotype) Reporter and

7              Notary Public of the State of New

8              York, do hereby certify that the

9              foregoing Deposition, of the witness,

10             ITZHAK C. HAIMOVIC, taken at the time

11             and place aforesaid, is a true and

12             correct transcription of my shorthand

13             notes.

14             I further certify that I am

15             neither counsel for nor related to any

16             party to said action, nor in any wise

17             interested in the result or outcome

18             thereof.

19             IN WITNESS WHEREOF, I have

20             hereunto set my hand this 26th day of

21             February, 2002.

22   

23   

24             ANNETTE FORBES, CSR, RPR

25

                    FINK & CARNEY
              REPORTING AND VIDEO SERVICES
    39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500